## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-62047-CIV-ALTMAN/Hunt

**ROBERT BEAN**,

    *Plaintiff,*

*v.*

**ES PARTNERS, INC.,** *et al.,*

    *Defendants.*

_____/

### <u>ORDER COMPELLING ARBITRATION</u>

The Defendants, a prescription medication "courier service" and its officers, hired the Plaintiff, Robert Bean, to deliver medications and medical devices to the company's Florida customers. When Bean accepted that job offer, he agreed to arbitrate any disputes arising under the Fair Labor Standards Act ("FLSA"). Bean later sued the Defendants for unpaid overtime wages under the FLSA and now seeks to avoid arbitration.

The Federal Arbitration Act ("FAA") generally requires courts to honor arbitration agreements—though the statute does exempt "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Bean claims that he falls into this exempt "class of workers engaged in . . . interstate commerce" because he delivers products that are manufactured in other states. As we detail below, however, even the two cases Bean cites support the Defendants' view that the FAA mandates arbitration of this dispute.

But Bean has a bigger problem. Putting aside the FAA, arbitration is a matter of state contract law, and the agreement he signed is plainly enforceable under Florida law. Bean doesn't deny that the Court could compel him to arbitration—irrespective of the FAA—so long as his arbitration agreement complies with Florida law. Bean argues, instead, that the agreement is void *both* because it purports to

award attorneys' fees to the prevailing party *and* because of a recent decision of the National Labor Relations Board ("NLRB"). But Florida law allows courts to sever invalid contractual provisions—like the attorneys'-fees provision at issue here—in a way that would leave the essence of our arbitration agreement intact. And this Court isn't bound by the NLRB's interpretation of the FAA, a statute it doesn't administer—especially when, as we'll see, that interpretation has been called into question by the Supreme Court of the United States.

As this summation suggests, the Defendants' Motion is **GRANTED**, the case is **STAYED and CLOSED**, and the parties are ordered to **ARBITRATION**.

## BACKGROUND

The Defendant, ES Partners Inc. d/b/a Med-Line Express Services ("Med-Line"), is a "prescription courier service" that "transports and distributes medical devices and pharmaceuticals in interstate commerce." Compl. [ECF No. 1-2] ¶ 20. Med-Line has "two (2) or more employees handling, selling, or otherwise working on goods or materials that ha[ve] been moved in or produced for commerce[.]" *Id.* ¶ 24. The Defendants, Steve Eaton and Elliot Saltz, are (respectively) Med-Line's CEO and President. *Id.* ¶¶ 4–5.

About three years ago, Med-Line and Bean entered into an Independent Contractor Agreement (the "Agreement"), which laid out Bean's rights and responsibilities as a "route driver." *See* Defendants' Motion to Stay Proceedings and Compel Arbitration ("Motion") [ECF No. 3], at Ex. A. According to that Agreement, Bean's duties primarily involve "[t]imely pickup and delivery of medication" to Med-Line customers, with various ancillary responsibilities such as "presentation and explanation to patients and/or caregivers of necessary paperwork[,] . . . [r]eturn of all non-delivered items[,] [and] written documentation of any service or delivery issues[.]" *Id.* § 4.

The Agreement includes an arbitration clause that broadly covers the parties' claims for violations of state or federal law (including the FLSA)—but only "[t]o the maximum extent permitted

2

by law." *Id.* § 20(a). The arbitration clause excludes any lawsuits seeking injunctive relief to enforce the Agreement's non-disclosure and non-solicitation provisions. *Id.* The clause also requires Bean to pay the arbitrator's initiation fees—in an amount "equal to what he would be charged as a first appearance fee in court"—and contemplates that the Defendants would be obliged to "advance the remaining fees and costs of the arbitration." *Id.* § 20(f). Under the terms of the Agreement, any arbitration award "shall provide for the prevailing party to recover from the other party the prevailing party's expenses and reasonable attorneys' fees relating to such action." *Id.* This is the attorneys'-fees provision to which Bean rightly objects. The Agreement, however, contains a severability clause, which provides that, "[i]f any provision . . . shall be held by a court of competent jurisdiction to be invalid, unenforceable or void, the remainder of this Agreement . . . shall remain in full force and effect." *Id.* § 17. The Agreement "shall be construed in accordance with, and all actions arising hereunder shall be governed by, the laws of the State of Florida." *Id.* § 22.

In September of 2020, Bean sued the Defendants in state court for (allegedly) refusing to pay overtime wages, in violation of Florida's minimum-wage law and the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 203, *et seq. See generally* Compl. The Defendants removed, *see* Notice of Removal [ECF No. 1], and then immediately moved to stay the case and compel arbitration, *see* Motion. In their Motion, the Defendants argue that the FAA mandates arbitration in this case. In the alternative, the Defendants contend that, even if the FAA doesn't compel arbitration, the Agreement's arbitration clause should be enforced as a valid contract. *See id.* at 10–11.

Bean doesn't deny that his claims fall within the scope of the Agreement's arbitration clause. *See generally* Plaintiff's Memorandum of Law in Opposition to Defendant ("Response") [ECF No. 15]. Instead, he claims to fit into the FAA's exclusion for "any other class of workers engaged in foreign or interstate commerce." *Id.* at 7. In support of this position, he appends an affidavit, in which he attests that (1) the goods he delivers for Med-Line are manufactured all over the country and arrive in

Florida by interstate carrier, and that (2) he has personally traveled out of the state with the Defendants on five separate occasions to help train new drivers (though not to deliver goods). *See* Bean Decl. [ECF No. 15-6] ¶¶ 9–10, 14, 20–22. The FAA aside, Bean also attacks the Agreement as illegal and unenforceable because (1) it provides for attorneys' fees and costs to the prevailing employer, in contravention of Florida law, and (2) it requires Bean to arbitrate all claims against the Defendants, in violation of an NLRB administrative decision. *See* Response at 15–19.

## THE LAW

Congress enacted the FAA in 1925 to "reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The FAA's coverage provision states that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. When one party has failed, neglected, or refused to comply with an arbitration agreement, the FAA requires the federal district court to compel arbitration. *See id.* § 4; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (the FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed").

The FAA embodies a "liberal federal policy favoring arbitration[.]" *Randolph v. Green Tree Fin. Corp.*, 244 F.3d 814, 818 (11th Cir. 2001). The FAA thus creates a "presumption of arbitrability" such that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) (explaining that "due regard must be given to the federal

policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration" (cleaned up)). But the FAA includes a narrow exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The party resisting arbitration bears the burden of showing that this exemption applies. *See, e.g., Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 913 (N.D. Cal. 2020) ("The plaintiffs, as the parties resisting arbitration, bear the burden of proving that this exemption applies."); *Morning Star Assocs., Inc. v. Unishippers Glob. Logistics, LLC*, 2015 WL 2408477, at *5 (S.D. Ga. May 20, 2015) ("To fit within the FAA's narrow exception and circumvent the clear Congressional intent that arbitration provisions be enforced, [the plaintiffs] have the burden to show . . . that they are transportation workers [under the exemption]." (citing *Gilmer*, 500 U.S. at 26)).

Whether an arbitration agreement is valid and enforceable is generally a matter of state contract law. *See Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005) (explaining that "state law generally governs whether an enforceable contract or agreement to arbitrate exists," and "in determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts"); *see also Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989) ("[T]he interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review."). After all, "arbitration is simply a matter of contract." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

**ANALYSIS**

## I.   THE FAA'S § 1 EXEMPTION DOESN'T APPLY

Bean says that the FAA doesn't apply to him because § 1 of that statute exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Not a seaman or a railroad employee, Bean claims that he fits into the third category—"any other class of workers engaged in . . . interstate commerce"—which courts refer to as

the exemption's "residual clause." *See* Response at 7–15. In support, Bean attests that Med-Line's medications are manufactured all over the country and notes that they arrive in Florida by interstate carrier. *See* Bean Decl. ¶¶ 9–10, 20–22. These medications and medical devices (he continues) are thus in the "flow" of interstate commerce, such that he is "engaged in . . . interstate commerce"—even though he only delivers the goods locally. *See* Response at 4.[1]

In *Circuit City v. Adams*, the principal case interpreting § 1, the Supreme Court held that the residual clause applies only to contracts for "transportation workers"—and not, as the Ninth Circuit had said, to *all* contracts of employment. *See Circuit City v. Adams*, 532 U.S. 105, 119 (2001) ("[T]he text of the FAA forecloses the construction of § 1 followed by the Court of Appeals in the case under review, a construction which would exclude all employment contracts from the FAA."). Applying the canon of *ejusdem generis*,[2] the Court determined that the terms "seamen" and "railroad employees" limited the scope of the phrase "other class of workers." *Id.* at 114–15. The Ninth Circuit's interpretation, the Court concluded, failed to give effect to those first two terms. *Id.* (noting that "there would be no need for Congress to use the phrases 'seamen' and 'railroad employees' if those same classes of workers were subsumed within the meaning of the 'engaged in . . . commerce' residual clause."). The Supreme Court also explained that the phrase "engaged in . . . interstate commerce" must be construed narrowly, as it has "a more limited reach" than the phrase "involved in" commerce, which appears in § 2 of the FAA ("the coverage clause") and represents the full extent of Congress's

---

[1] In his Complaint, Bean says that he's been "misclassified" as an independent contractor, *see* Compl. ¶ 15, notwithstanding the title of his "Independent Contractor Agreement." The parties don't address this issue in their briefing—probably because the distinction doesn't matter much. The Supreme Court, after all, has held that § 1's exemption applies to agreements for independent contractors. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543–44 (2019) (holding that the term "contracts of employment" refers to "agreements to perform work").

[2] *See* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 199 (2012) ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned.").

Commerce Clause power. *Id.* at 115–16 (citing *Jones v. United States*, 529 U.S. 848, 855 (2000), *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273 (1995), and *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 279–80 (1975)); *see also id.* at 118 ("The plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'").

Unfortunately, *Circuit City* doesn't answer the specific question presented here. The Court didn't, for instance, define the class of "transportation workers" to whom the residual clause applies. Nor did it outline the test lower courts should apply in determining whether a "transportation worker" is, in fact, "engaged in" interstate commerce. The Court simply rejected the Ninth Circuit's holding— that the residual clause applied to *all* contract of employment—and found that the plaintiff, a salesman, was not a "transportation worker." *Cf. Heller v. Rasier, LLC*, 2020 WL 413243, at *6 (C.D. Cal. Jan. 7, 2020) (explaining that, after *Circuit City*, "there is not a clear definition or consensus of what constitutes a 'transportation worker' who is 'engaged in interstate commerce'").

In *Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286 (11th Cir. 2005), the Eleventh Circuit added *some* gloss to *Circuit City*'s "transportation workers" category by holding that an "account manager" at a retail store was not a "transportation worker"—even though his job required him, from time to time, to use his employer's truck to deliver goods across state lines. *See id.* at 1288. In saying so, the court read *Circuit City* as placing the "emphasis" on "a class of workers in the transportation industry, rather than on workers who *incidentally* transported goods interstate as part of their job." *Id.* at 1289 (emphasis added). The plaintiff in *Hill*, whose out-of-state transportation work was incidental to his primary responsibilities, was "clearly not a member of such a class." *Id.* at 1290. The Eleventh Circuit thus didn't address the "engaged in . . . interstate commerce" element of the residual clause at all. *See generally id.* But the court did say that there was "no indication that Congress would be any more concerned about the regulation of the interstate transportation activity incidental to [the plaintiff's] employment

as an account manager, than it would in regulating the interstate 'transportation' activities of an interstate traveling pharmaceutical salesman who incidentally delivered products in his travels, or a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town." *Id.* at 1289–90.

The parties read too much into these decisions.[3] Neither case, after all, answered the question we have here—*viz.*, whether a local delivery driver who *never* crosses state lines is a "transportation worker" "engaged in . . . interstate commerce" because the goods he delivers are manufactured outside the state. While it's true that, colloquially speaking, Bean may be a "transportation worker," he's not *necessarily* one who's "engaged in" interstate commerce.

Trying to pin the issue down, Bean cites *American Postal Workers Union, AFL-CIO v. United States Postal Service*, 823 F.2d 466, 473 (11th Cir. 1987), for the proposition that a transportation worker doesn't need to cross state lines to be exempted by § 1. *See* Response at 8. In that case, the Postal Workers Union sued to vacate an arbitration award that had been entered under the auspices of a collective bargaining agreement the Union had signed with the U.S. Postal Service. *Id.* at 467. The Eleventh Circuit held that the postal workers were exempted under § 1. *See* 823 F.2d at 473.

But *American Postal Workers* only supports Bean's position *if* one assumes that mail carriers (as a class) *never* cross state lines—a baseless assumption Bean never properly justifies. While some postal workers (like Bean) surely make only local deliveries, others *must* cross state lines to transport out-of-state mail. Either way, *American Postal Workers* did not address the question we have here and is of little value to us. The main issue in *American Postal Workers* was whether the collective bargaining agreement was a "contract of employment" under § 1—a point the Postal Service had contested. *See id.* at 470–

---

[3] Bean's point, for example, that *Circuit City* "did not state that an employee must cross state lines in order to be considered a transportation worker," Response at 7, is both true and irrelevant. The Court in *Circuit City* didn't address this question because the plaintiff—a retail salesman—was not a transportation worker *at all*.

73. As for whether the postal workers were "engaged in" interstate commerce—our question—the Court simply assumed that they were because "the Postal Service d[id] not seriously argue otherwise." *Id.* at 473. The court noted that other circuits *had* addressed the question of whether § 1 was limited to "workers actually engaged in interstate commerce." *Id.* But the Eleventh Circuit didn't need to "choose sides in this debate"—not just because the Postal Service had conceded the point, but also because postal workers play a unique role in our system of interstate commerce: as the court explained, "without them, 'interstate commerce,' as we know it today, would scarcely be possible." *Id.* Neither aspect of *American Postal Workers* applies here: our Defendants (unlike the Postal Service) do question whether Bean is "engaged in" interstate commerce; and medical supply drivers who make purely local deliveries are not, in the context of interstate commerce, similarly situated to postal workers.

But there's another, more obvious, and much more important reason to limit the application of *American Postal Workers*: it preceded the Supreme Court's decisions in *Circuit City* and *Allied-Bruce*, both of which distinguished between the phrase "engaged in . . . interstate commerce" as it appears in § 1 and the broader fragment "involving commerce" in § 2. *See Circuit City*, 532 U.S. at 118; *Allied-Bruce*, 513 U.S. at 273. In *American Postal Workers*, the Eleventh Circuit concluded that the two phrases were mirror images of each other—an equivalence the Supreme Court specifically rejected in *Circuit City* and *Allied-Bruce*. The Postal Service, the Eleventh Circuit said, couldn't argue that the postal workers weren't engaged in "commerce" because that argument "would not only take the collective bargaining agreement out of the exclusionary language in section one, it would also remove the agreement from the inclusionary language of section two." *Am. Postal Workers Union*, 823 F.2d at 473 n.10. But this logic doesn't work after *Circuit City* and *Allied-Bruce*, which made clear that § 1 and § 2 *aren't* mirror images of each other, such that an employment contract can now simultaneously (1)

"involve" commerce[4]—and, therefore, fall *within* the scope of the FAA under § 2—and yet, (2) govern the employment of a "transportation worker" who is *not* "engaged in" interstate commerce, such that the contract would fall *outside* the § 1 exclusion.

Bean's reliance on this abrogated aspect of *American Postal Workers* thus reveals the weakness in his position. He says that, "if this Court were to find that the distributors do not fall under the transportation worker exemption to the FAA, because their work pertains only to local intrastate deliveries, then the logical implication is that the FAA does not even apply here at all because Section 2 limits the application of the FAA to contracts involving interstate commerce." Response at 13 n.7. Again, this argument ignores the important distinction between § 1 and § 2—a distinction the Supreme Court has now twice emphasized. Because § 2 is broader than § 1—and is coextensive with Congress's Commerce Clause power—there *must be* some subset of "transportation workers" who fit *within* the reach of § 2, even as they fall *beyond* the scope of § 1. As we explain more fully below, we think that Bean fits snugly into this narrow interstice.

So, what lessons can we draw from *Circuit City* here? It doesn't *squarely* resolve our case—as we've seen. Still, its interpretative principles—that the § 1 exemption must be construed *narrowly*, that the residual clause's scope must be read in reference to "seamen" and "railroad workers," and that "engaged in . . . interstate commerce" is *not* coextensive with Congress's full Commerce Clause power—favor the Defendants' view. *Hill*, for its part, reaffirmed these principles and strongly suggests that Bean's five out-of-state trips—for training purposes incidental to his primary responsibilities as a delivery driver—are *not* relevant for determining whether he fits within the § 1 exemption.[5]

Finding themselves without binding authority, the parties reach beyond our Circuit, where

---

[4] (i.e., "affect" commerce to the full extent of the Commerce Clause).
[5] Bean doesn't really argue otherwise, *see generally* Response—although he does mention the out-of-state trips in his affidavit, *see* Bean Decl. ¶ 14.

several courts "have grappled with" these "unresolved issues"—though, even there, "little consensus has been realized." *Saxon v. Sw. Airlines Co.*, 2019 WL 4958247, at *4 (N.D. Ill. Oct. 8, 2019). In fact, of the three circuits—the First, Seventh, and Ninth—that *have* addressed our issue in the context of local delivery drivers, two tests have emerged. Bean likes one of the tests better than the other, but— as we're about to see—he fails them both.

In *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798 (7th Cir. 2020), the Seventh Circuit held that the § 1 inquiry "is always focused on the worker's active engagement in the enterprise of moving goods across interstate lines." *Id.* at 802. Given the restrictiveness of this test, the court (unsurprisingly) found that local drivers who only delivered meals *intra*-state did not fit within the § 1 exemption. *See id.* at 803. In doing so, the court specifically rejected the argument Bean offers here—that he's "engaged in . . . interstate commerce" because he delivers medications and medical devices, "many of which are manufactured out of state." Response at 14. In *Wallace*, the plaintiffs argued that "[a] package of potato chips . . . may travel across several states before landing in a meal prepared by a local restaurant and delivered by a Grubhub driver[.]" *Wallace*, 970 F.3d at 802. Nevertheless, to fall within the exemption, the court held that the "the workers must be connected *not simply to the goods, but to the act of moving those goods across state or national borders.*" *Wallace*, 970 F.3d at 802 (emphasis added). In the court's view, Congress could not have intended the FAA's exemption to "sweep in numerous categories of workers whose occupations have nothing to do with interstate transport—for example, dry cleaners who deliver pressed shirts manufactured in Taiwan and ice cream truck drivers selling treats made with milk from an out-of-state dairy." *Id.* at 802. Since Bean likewise isn't engaged in the business of delivering goods across state lines, he fails the *Wallace* test. In the Seventh Circuit, then, Bean wouldn't qualify for the § 1 exemption.

Acknowledging this, Bean asks us to follow the less restrictive test established by the First and Ninth Circuits. Unlike the Seventh's Circuit's test, which asks whether the *worker* travels across state

lines, the First and Ninth Circuits focus on the *goods* themselves. In two recent cases, these courts held that Amazon's "last mile" delivery drivers—local drivers who deliver packages on the last leg of their interstate journeys—are exempt under § 1. *See Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 26 (1st Cir. 2020); *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 919 (9th Cir. 2020). In saying so, however, both courts relied on the *continuity* of the goods' travel—*viz.*, on their having not yet come to rest—rather than on their (interstate) provenance.

In *Waithaka*, for instance, the First Circuit cited contemporaneous interpretations of the Federal Employers' Liability Act ("FELA")—a statute enacted shortly before the FAA—in support of its view that the phrase "engaged in . . . interstate commerce" referred to "those who transported goods or passengers that *were moving* interstate." *Waithaka*, 966 F.3d at 19–20 (emphasis added).[6] We emphasize the past continuous sense of the phrase—*were moving*—because it denotes continuity. Grammar aside, *Waithaka* relied on *Philadelphia & Reading Railway Co. v. Hancock*, 253 U.S. 284, 285–86 (1920), where the Supreme Court held that a railroad employee who never left the state was "engaged in" interstate commerce for purposes of FELA—but only because (1) the worker was part of a train crew that eventually delivered coal out of state *and* (2) "[t]here was no interruption of the

---

[6] The FELA precedent had also swept in "those who were not involved in transport themselves but were in positions 'so closely related' to interstate transportation 'as to be practically a part of it.'" *Waithaka*, 966 F.3d at 20 (quoting *Shanks v. Del., Lackwanna,* & W.R.R. Co., 239 U.S. 556, 558–59 (1916)). For purposes of deciding whether Amazon's "last mile" drivers were "engaged in . . . interstate commerce," however, the First Circuit ignored this second category, thus "limit[ing] [its] focus to the first group"—i.e., those who transport goods or passengers that are still "moving" interstate. *Id.* Either way, Bean never argues that he fits into this second category, *see generally* Response—and so, he's waived the point, *see, e.g.*, *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

movement [of the coal]; it always continued towards points as originally intended." *Id.* at 286; *see also Waithaka*, 966 F.3d at 22 (interpreting *Circuit City* as "focus[ed] on 'the flow of interstate commerce'" and explaining that earlier cases, like *Hancock*, "show[ed] that workers moving goods or people destined for, or coming from, other states—even if the workers were responsible only for an *intrastate leg of that interstate journey*—were understood to be 'engaged in interstate commerce' in 1925." (emphasis added)).

> The Ninth Circuit, in *Rittmann*, put a finer point on it:

> Amazon packages do not "come to rest," at Amazon warehouses, and thus the interstate transactions do not conclude at those warehouses. The packages are not held at warehouses for later sales to local retailers; they are simply part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys. The interstate transactions between Amazon and the customer do not conclude until the packages reach their intended destinations, and thus AmFlex drivers are engaged in the movement of interstate commerce.

971 F.3d at 916. In other words, the Ninth Circuit's restatement of the First Circuit's test has two elements: *one*, the delivery company must be in the business of interstate transportation; and *two*, the packages must *still* be in the "stream" of commerce when the driver delivers them locally. *Id.* at 915; *see also id.* at 923 (Bress, J., dissenting) (interpreting the majority decision as holding, not that "[t]he residual clause covers any delivery person transporting anything between any two points," but that it "covers only certain intrastate delivery workers depending upon some other factors . . . such as the nature of the company they work for, the nature of the goods that are transported, and/or whether the goods are delivered as part of a 'continuous' interstate transportation").

> *Rittman* is also significant for what it didn't say—or, more precisely, for the district court precedent it chose *not* to abrogate. Before *Rittman*, the Northern District of California had held that a local delivery driver was *not* an exempt "transportation worker" under § 1 of the FAA. *See Lee v. Postmates Inc.*, 2018 WL 6605659 (N.D. Cal. Dec. 17, 2018). Like Bean, Lee had argued that she "delivered packaged goods presumably produced out of state." *Id* at *7. Because she delivered goods

from "local merchants" and "for a company that [did] not hold itself out as transporting goods between states," however, the court concluded that she was not a "transportation worker" within the meaning of *Circuit City. See id.* Normally, we wouldn't make too much out of a distant district court opinion, but *Rittman* chose to leave *Lee* intact—distinguishing it rather than overruling it. *See Rittman*, 971 F.3d at 916 (agreeing with the district court that "cases involving food delivery services like Postmates or Doordash are . . . distinguishable," and citing *Lee* with approval); *see also id.* at 916–17 (distinguishing, and not disagreeing with, *Wallace* by pointing out that, unlike local food delivery drivers, "AmFlex workers *complete the delivery of goods that Amazon ships across state lines*" (emphasis added)).

Bean, of course, is much more like the employees in *Lee* and *Wallace* than he is like the drivers in *Rittman* and *Waithaka*. Like all four of these other plaintiffs, Bean attests that the medications and devices he delivers are *manufactured* out of state—and, therefore, that they arrive in Florida through interstate carriers. *See* Bean Decl. ¶¶ 9–10, 20–22. But he has utterly failed to show—as *Rittman* and *Waithaka* require—that the medications he delivers are *still* in the "stream" or "flow" of interstate commerce when he delivers them. *See generally* Response. He has, in other words, failed to establish that, before he delivers them, the goods have not first "come to rest" *somewhere* in Florida. Nor has he demonstrated—as the first *Rittman* element mandates—that Med-Line is in the business of transporting medications across state lines. *See generally id.* Instead, he says only that Med-Line offers "same day pharmaceutical deliveries," *id.* at 3, which suggests that its drivers pick up from local warehouses, merchants, or pharmacies, and then deliver to customers *within* Florida—not that they're in the business of moving medications across state lines. Since the affidavit is silent on this all-important question, we might justifiably assume that *other* shippers (like FedEx or UPS, for example) bring the medications into Florida—where the goods "come to rest" at warehouses, third-party merchants, or pharmacies—and that Med-Line gets involved only when customers want those goods delivered locally from those "at rest" locations. We needn't speculate, though, because it was

indisputably Bean's burden to prove that the exemption applies to him. *See, e.g.*, *Rogers*, 452 F. Supp. 3d at 913. Since Bean plainly fails the Seventh Circuit's test—and since he has failed to satisfy the two elements of the First and Ninth Circuits' tests—§ 1 doesn't save Bean from arbitration here.

## II.   THE AGREEMENT IS VALID AND ENFORCEABLE

Because Bean's Agreement is covered by the FAA—and since the Agreement mandates that he arbitrate this FLSA dispute, *see* Agreement § 20(a) (covering FLSA claims and all other claims under state or federal law)—we must compel arbitration "save upon such grounds as exist at law or in equity for the revocation of any contract," FAA § 2. Bean argues that the Agreement is unenforceable under Florida law because it includes a provision that awards attorneys' fees to the prevailing party. *See* Response at 2. He also insists that the Agreement violates a different statute that has nothing to do with our case (the NLRA) because it "explicitly prohibits the filing of claims" with the NLRB. *See id.* Although the Court must sever the attorneys'-fees provision from the Agreement, the Agreement is otherwise enforceable—and so, we must compel arbitration in the circumstances presented here.[7]

### A.  Attorneys' Fees

Bean maintains that the Agreement's attorneys'-fees provision renders the entire arbitration clause unenforceable under Florida law.[8] *See id.* at 15 (arguing that "binding Florida law holds that the

---

[7] For that reason, the FAA's application to the Agreement isn't dispositive here. Even if Bean *were* exempt from the FAA, in other words, he could still be required to arbitrate—and he doesn't suggest otherwise. He never, in short, claims that the FAA exemption would (standing alone) void the Agreement's arbitration clause. *See generally* Response. Nor could he. *See Waithaka*, 966 F.3d at 26 ("Having concluded that the FAA does not govern the enforceability of the dispute resolution section of the Agreement . . . we must now decide whether such arbitration may still be compelled pursuant to state law."); *Breazeale v. Victim Servs., Inc.*, 198 F. Supp. 3d 1070, 1079 (N.D. Cal. 2016) ("When a contract with an arbitration provision falls beyond the reach of the FAA, courts look to state law to decide whether arbitration should be compelled nonetheless."); *Shanks v. Swift Transp. Co.*, 2008 WL 2513056, at *4 (S.D. Tex. June 19, 2008) ("While the FAA does not require arbitration [in this case], the question remains whether the exemption of Section 1 operates as a form of reverse preemption, so as to prohibit arbitration of the dispute altogether. Plainly, it does not. The weight of authority shows that even if the FAA is inapplicable, state arbitration law governs.").

[8] The Agreement is governed by Florida law. *See* Agreement § 22.

arbitration agreement is unenforceable, because it includes a prevailing party attorney's fee provision that contradicts the one-way attorney's fee provision [of] the FLSA"); *see also* Agreement § 20(f) (requiring that any arbitration award "shall provide for the prevailing party to recover from the other party the prevailing party's expenses and reasonable attorneys' fees relating to such action"). In support, Bean relies primarily on *Hernandez v. Colonial Grocers, Inc.*, 124 So. 3d 408, 409 (Fla. 2d DCA 2013), where an employee sued his employer under the FLSA and argued that the parties' arbitration agreement was unenforceable because it contained (1) a provision that required the parties to share the initial arbitration cost and (2) a provision that awarded attorneys' fees to the prevailing party. Without addressing the first provision—which, in any case, isn't relevant here—the Second DCA held that the attorneys'-fees provision was unenforceable. *Id.* at 410 ("The attorney's fees provision of the [FLSA] is intended to encourage employees to seek redress when they believe they have been wronged by an employer. The arbitration agreement, however, does just the opposite—it discourages the employee from pursuing a claim.").

Although *Hernandez* didn't say whether the offending fee-shifting clause could be severed, *see generally id.*, Bean insists that the Second DCA's decision somehow "precludes" severability here, *see* Response at 16. Of course, a decision that *nowhere* addresses severability cannot foreclose the application of that well-settled doctrine in a later case—and Bean never explains how it could. In any event, Bean is mistaken. Florida courts routinely hold that attorneys'-fees provisions *can be* severed from arbitration agreements. Indeed, under Florida law, *any* invalid provision in an arbitration agreement can be severed so long as it doesn't strike at the heart (or essence) of the agreement. And that's true, by the way, even if the agreement is silent on severability—an extension of the doctrine we needn't reach here because our Agreement contains an unambiguous severability clause. *See* Agreement § 17.

In *Hochbaum ex rel. Hochbaum v. Palm Garden of Winter Haven, LLC*, 201 So. 3d 218 (Fla. 2d DCA

16

2016), for example, the Second DCA (the very same court that decided *Hernandez*) held that an arbitration agreement violated public policy because it required each party to pay its own costs and fees. *Id.* at 223. Nevertheless, the court compelled the parties to arbitration because the offending provision didn't go to the heart of the agreement. As the court explained:

> [T]he offending provision *deals only with attorneys' fees*. The provision does not require the arbitration to be conducted in accordance with certain rules, and it does not limit the compensatory or punitive damages that [the plaintiff] may recover in arbitration. Therefore, the offending provision is severable from each agreement because it does not go to the essence of the agreement. . . . Because the offending provision is severable from the arbitration agreements, we affirm the order compelling arbitration but remand with instructions to strike the attorneys' fees provision from the agreements.

*Id.* (emphasis added). And, as we've suggested, the court severed the provision *even though* the contract didn't include a severability clause. *See id.* at 222 ("[T]he existence of a severability clause is not determinative of whether an offending provision may be severed from the agreement and . . . the controlling issue is whether an offending clause or clauses go to the very essence of the agreement." (cleaned up)).

Several recent Florida cases have followed suit. *See, e.g.*, *4927 Voorhees Rd., LLC v. Tesoriero*, 291 So. 3d 668, 671 (Fla. 2d DCA 2020), *review denied*, 2021 WL 50180 (Fla. Jan. 6, 2021) (explaining that, "[w]hereas rules and procedures peculiar to the chosen forum might arguably go to the essence of an arbitration agreement, the same cannot be said for extraneous substantive provisions governing available damages or attorney's fees," and holding that a "[f]ees and [c]osts provision, which provide[d] that each party [was] responsible for their own attorney's fees and costs in any dispute" was severable); *Rockledge NH, LLC v. Miley By & Through Miley*, 219 So. 3d 246, 249 (Fla. 5th DCA 2017) ("Because the offending attorneys' fee provision was severable from the arbitration agreement, we conclude that the trial court erred in denying the motion to compel arbitration.").

Bean tries to distinguish *Hochbaum*—to no avail. He says that the pay-your-own fees provision in *Hochbaum* is "similar to the cost-sharing provision at issue in *Hernandez* which the Second DCA held

was severable, [but] not the prevailing employer fee provision, which *Hernandez* held is not." Response at 16 n.11. Here, Bean mischaracterizes *Hernandez*, which didn't discuss severability at all. *Hochbaum*, by contrast—which *did* address severability—drew no distinction between different kinds of attorneys'-fees provisions (*viz.*, pay-your-own-way versus prevailing-party). Instead, it held—as many Florida courts have—that the question of severability turns on whether an offending provision gets at the heart of the agreement. *See Hochbaum*, 201 So. 3d at 218. And, because the provision in that case "deal[t] only with attorney's fees"—rather than, for example, with the arbitration's procedures or available damages—it *was* severable. *Id.*

The provision in this case—a prevailing-party fee provision—is, to be sure, different from the provision at issue in *Hochbaum*. But no aspect of that distinction compels a different result here. To the contrary, *Hochbaum*'s reasoning—that fee provisions are severable because they "deal[ ] only with attorneys' fees" and "do[ ] not require the arbitration to be conducted in accordance with certain rules [or] limit the compensatory or punitive damages"—applies with equal force to *all* fee provisions, whether they're of the prevailing-party variety or not.

We note, moreover, that at least one judge in our District has severed a prevailing-party fee provision from an arbitration agreement—just as we do here. We note, too, that the judge in question wasn't just any old judge. Applying Florida law, Judge Rosenbaum—now of the Eleventh Circuit— held (in the context of a prevailing-party fee provision) that "invalidating [that provision] and severing it from the remaining, lawful provisions of the [a]greement pursuant to [the agreement's severability clause] fully remedies that problem." *Oramas v. Kleen 1, LLC*, 2013 WL 12153605, at *3 (S.D. Fla. July 13, 2013); *see also id.* ("[T]he fact that the Agreement purports to authorize the arbitrator to award a prevailing employer fees in a case where an employee claims violation of his FLSA rights does not invalidate the arbitration provision.").

Since the Agreement's fees provision is easily severable, the arbitration clause is enforceable,

and Bean must pursue his claims (if at all) in arbitration.

### B. THE NLRB'S ADMINISTRATIVE DECISION

In his final argument, Bean advances an unusual claim. The arbitration clause (he says) is unenforceable because it contravenes the FAA, insofar as it (allegedly) requires him to "waive the right to file administrative charges" under the NLRA, Title VII, and other remedial statutes. *See* Response at 17. Here, Bean relies exclusively on *Prime Healthcare Paradise Valley, LLC*, 368 N.L.R.B. 10 (2019), where the NLRB concluded that an "arbitration agreement that explicitly prohibits the filing of claims with the [NLRB] or, more generally, with administrative agencies must be found unlawful" under the FAA. *Id.* at *8; *see also id.* ("[T]he FAA does not authorize the maintenance or enforcement of agreements that interfere with an employee's right to file charges with the [NLRB]."). Because the Agreement requires the parties to arbitrate "all claims and disputes"—without some carve-out for NLRA claims—the Agreement (Bean submits) is unenforceable under *Prime Healthcare*. *See* Response at 19.

We needn't spill too much ink on this argument. Bean hasn't filed an administrative grievance with the NLRB. He's sued the Defendants in federal court under the FLSA.[9] He doesn't cite—and we can't find—any authority for his position that a federal court *must* (or even should) disregard a valid arbitration agreement and flout the FAA based on the NLRB's view of the appropriate intersection between the FAA and the NLRA.

And there's good reason for the omission: no such authority exists. In fact, the Supreme Court recently rejected a similar argument in *Epic Systems*—a decision Bean conveniently ignores, *see generally* Response. To understand why *Epic Systems* is so important here, we'll have to delve into the history a bit. In 2012, the NLRB held (in a case called *Horton*) that the NLRA "effectively nullifie[d]" the FAA

---

[9] (and an analogous state law).

for arbitration agreements that required individualized arbitration of FLSA disputes and thereby prevented FLSA collective actions. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1620 (2018) (citing *In Re D. R. Horton, Inc.*, 357 N.L.R.B. 2277 (2012)). Four years later, relying on *Horton*, the Ninth Circuit reversed an order compelling arbitration, holding that "an agreement requiring individualized arbitration proceedings violates the NLRA by barring employees from engaging in the 'concerted activit[y],' 29 U.S.C. § 157, of pursuing claims as a class or collective action." *Id.* In so holding, the Ninth Circuit reasoned that the FAA's "saving clause" (found in § 2 of that statute) vitiates the district court's obligation to compel arbitration in cases where the arbitration agreement violates some other federal law. *Id.*

The Supreme Court reversed, noting that the FAA's saving clause "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,'" but *not* "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* at 1622 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). The Court thus rejected the employees' position because they "[didn't] suggest that their arbitration agreements were extracted, say, by an act of fraud or duress or in some other unconscionable way that would render any contract unenforceable"—but, rather, objected "precisely because [the arbitration agreements] require individualized arbitration proceedings instead of class or collective ones." *Id.* "And by attacking (only) the individualized nature of the arbitration proceedings, the employees' argument seeks to interfere with one of arbitration's fundamental attributes." *Id.*

The employees in *Epic Systems* also contended that the NLRA overrode the FAA in cases requiring collective-action waivers. *Id.* at 1623–24. The Court rejected this position, too. It found no conflict between the FAA and the NLRA on the question of individualized arbitration and concluded that the NLRA didn't otherwise displace the FAA in that space. *See id.* at 1623–29. It even pointed out

that, "[i]n many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the [FAA] and other federal statutes [and] has rejected every such effort to date (save one temporary exception since overruled)[.]" *Id.* at 1627 (collecting cases).

Bean never mentions *Epic Systems.* He also never explains why his Agreement triggers the FAA's "saving clause" and doesn't tell us how his claim that the NLRA overrides the FAA survives after *Epic Systems.* Nor could he. Bean's position, after all, is weaker than the similar position the employees took in *Epic Systems.* In that case, remember, the employees had challenged only the aspect of their arbitration clauses that prevented them from representing a putative class. The Supreme Court, as we've seen, rejected this challenge as an attack on a "fundamental attribute" of arbitration. *Id.* at 1622. Bean, by contrast, isn't just challenging an aspect of arbitration; he is, rather, attacking arbitration itself. In other words, Bean's issue appears to be that, instead of allowing him to pursue his claims before the NLRB, the Agreement requires him to arbitrate those claims.[10] In essence, then, he's saying that the Agreement "is unenforceable just because it requires bilateral arbitration"—an argument that, as the Supreme Court has told us, "impermissibly disfavors arbitration." *Id.* at 1623. But the point here is that, unlike the employees in *Epic Systems*—whose argument would have allowed for arbitration agreements in cases (like ours) that don't involve class actions—Bean's position, if accepted, would make all arbitration clauses unlawful. As this comparison makes clear, *Epic Systems* squarely forecloses his claim.

Alternatively, if Bean's suggesting that the NLRA displaces the FAA wholesale—because (so

---

[10] Bean does say, at one point, that the Agreement "explicitly prohibits" him from filing NLRB claims, *see* Response at 2, but that simply isn't true. Nowhere does the Agreement forbid him from filing complaints with the NLRB. *See generally* Agreement. Instead, it encompasses a bilateral agreement to submit all claims—"[t]o the maximum extent permitted by law"—to arbitration. *See id.* § 20(a). Since his Agreement never mentions the NLRB, his argument necessarily sweeps in *all* arbitration agreements—both those that mention the NLRB and those that don't. In other words, if we were to accept Bean's position, we'd be calling all arbitration agreements illegal.

the argument goes) the NLRA renders illegal any agreement to arbitrate "all claims"—then he necessarily runs up against the unambiguous holding of *Epic Systems* and, for that matter, the Court's many cases "reject[ing] efforts to conjure conflicts between the [FAA] and other federal statutes." *Id.* at 1627.

Casting this pesky Supreme Court precedent aside, Bean says that "binding law of the United States Supreme Court and Florida commands that the Court is bound by the holdings of the NLRB with regard to issues even arguably subject to Sections 7 and 8 of the NLRA." Response at 17. Even if this were true as a general matter—it isn't[11]—Bean skips a key premise in the argument: he fails to show that our case fits into Sections 7 and 8 of the NLRA. The former provides that:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157; *see also Epic Sys.*, 138 S. Ct. at 1624 ("Section 7 focuses on the right to organize unions and bargain collectively."). The latter makes it unlawful for an employer to prevent her employees from forming a labor organization or otherwise exercising their rights under Section 7—i.e., their right to self-organize and to bargain collectively. *See* 29 U.S.C. § 158(a). Bean never explains how the

---

[11] Even according to its most expansive applications, *Chevron* and its progeny never suggest that a federal court is *bound* by the holdings of an executive agency. *See generally Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Federal courts, it's true, must *defer* to an agency's interpretation of a federal statute—but only where (1) the statute is one the agency is charged with administering, and (2) the interpretation is reasonable. *See Hylton v. U.S. Att'y Gen.*, 2021 WL 1201319, at *2 (11th Cir. Mar. 31, 2021) ("As a general rule, an agency's interpretation of a statute which it administers is entitled to [*Chevron*] deference if the statute is silent or ambiguous and the interpretation is based on a reasonable construction of the statute." (quoting *Sanchez Fajardo v. U.S. Att'y Gen.*, 659 F.3d 1303, 1307 (11th Cir. 2011)). Since the NLRB doesn't administer the FAA—and given *Epic Systems*' holding that the NLRA doesn't displace the FAA—Bean's *Chevron*-binds-us argument fails on both counts.

22

Defendants—through the Agreement—interfered with his right to form a labor organization or to bargain collectively. *See generally* Response. As far as we can tell, he isn't trying to exercise any of these collective-bargaining rights, nor has he even tried to invoke the NLRB's jurisdiction by filing an administrative complaint. He simply wants to avoid arbitrating a kind of individualized dispute he long ago agreed to arbitrate.

As far as deferring to the NLRB's decision in *Prime Healthcare*, we refer Bean back to *Epic Systems*, which reminds us that the NLRB is not tasked with administering the FAA and, therefore, receives no deference in its construction of that statute. *See Epic Sys.*, 138 S. Ct. at 1629 (explaining that, where the NLRB "hasn't just sought to interpret its statute, the NLRA, in isolation," but "has sought to interpret this statute in a way that limits the work of a second statute, the [FAA]," it does not receive *Chevron* deference). More than that, as we've explained, we don't find *Prime Healthcare* remotely persuasive in light of *Epic Systems*.

The point is this: the Agreement (stripped of its attorneys'-fees provision) contains a valid and enforceable arbitration clause under Florida law. And no NLRB decision requires us to say otherwise.

\*\*\*

After careful review, the Court hereby **ORDERS** and **ADJUDGES** as follows:

1. The Motion [ECF No. 3] is **GRANTED**.

2. This case is **STAYED** pending arbitration.

3. That arbitration shall proceed in accordance with the terms of the Agreement [ECF No. 3], at Ex. A—except to the extent that the Agreement conflicts with this Order. Specifically, the attorneys'-fees provision found in § 20(f) of the Agreement shall be severed.

4. The Clerk shall **CLOSE** this case. All pending deadlines and hearings are **TERMINATED**, and any pending motions are **DENIED AS MOOT**.

5.  Any party may move to reopen the case for good cause.

6.  Every **thirty (30) days** after the date of this Order, the parties shall jointly file a status report regarding the status of their arbitration proceedings.

7.  Within **fifteen (15) days** of the arbitration's conclusion, the parties shall jointly file a notice briefly describing the outcome of arbitration.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 2nd day of April 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record